IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LINDA PAULSON,          )
                             )
     Plaintiff,       )
                             )
     v.                  )     Civil Action No. 1:22-cv-877 (RDA/IDD)
                             )
GUARDIAN LIFE INSURANCE  )
COMPANY OF AMERICA,     )
                             )
     Defendant.     )

**<u>MEMORANDUM OPINION AND ORDER</u>**

      This matter comes before the Court on cross-motions for summary judgment filed by the parties.[1]  *See* Dkt. Nos. 53 ("Guardian's Motion"); 55 ("Paulson's Motion").  The Court has dispensed with oral argument as it would not aid in the decisional process.  Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter has been fully briefed and is now ripe for disposition.

      Considering Guardian's Motion, Guardian's Memorandum in Support (Dkt. 54), Paulson's Brief in Opposition (Dkt. 59), Guardian's Reply (Dkt. 60), as well as Paulson's Motion, Paulson's Memorandum in Support (Dkt. 56), Guardian's Brief in Opposition (Dkt. 58), and Paulson's Reply (Dkt. 61), it is hereby ORDERED that Guardian's Motion for Summary Judgment is GRANTED-IN-PART, DENIED-IN-PART and DEFERRED-IN-PART and it is further ORDERED that Paulson's Motion for Partial Summary Judgment is GRANTED-IN-PART, DENIED-IN-PART and DEFERRED-IN-PART.

---

[1] For ease of reference, Plaintiff Linda Paulson will be referred to as "Paulson" and Defendant Guardian Life Insurance Company of America will be referred to as "Guardian."

## I.  BACKGROUND

### A.  Undisputed Facts

Summary judgment is appropriate only where there are no genuine disputes of material fact.  Fed. R. Civ. P. Rule 56.  To this end, Guardian, in compliance with Rule 56 and Local Rule 56, set forth a statement of material facts in separate enumerated paragraphs that it, as the movant, contends are undisputed and supported by record citations.  Paulson did not comply with this requirement to list the facts which she contends are undisputed with citations to the record in her own Motion.  *See* Dkt. 56 (providing a narrative of the facts, often without record citations).  The Rules next require a nonmovant to respond to a movant's statement of undisputed fact by "listing all material facts to which it is contended that there exists a genuine dispute" with citations to the record.  L.R. 56(B).  Guardian also complied with this portion of the Rule.  Paulson, however, did not assert that any of the facts asserted by Guardian are disputed.  *See* Dkt. 59 (no statements or arguments regarding disputed facts).  Paulson's noncompliance with the Local Rules make it difficult for the Court to determine whether there are any disputes between the parties as to the facts.

Nevertheless, Paulson's noncompliance with the rules does not preclude review here nor does it weigh in favor or against either party.  Here, the claims at issue involve the denial of disability benefits arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Dkt. 1.  Courts recognize that, in a ERISA benefits denial case, "a motion for summary judgment is, in most respects, merely a conduit to bring the legal question before the district court, and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists do not apply."  *Schkloven v. Hartford Life & Accident Ins. Co.*, 2022 WL 2869266, at * 14 (D. Md. July 21, 2022) (internal citations and quotations omitted);

2

*Keith v. Fed. Express Corp. LTD Plan*, 2010 WL 1524373, at *4 n.4 (W.D. Va. Apr. 15, 2010) (same).  Accordingly, the following statement of facts is derived from a careful review of (i) Guardian's statement of undisputed facts, which are uncontested by Paulson; (ii) Paulson's "Statement of Facts" and Guardian's response thereto; and (iii) the Administrative Record as a whole.[2]  The undisputed facts are as follows:

1.      At the time of her disability claim, Paulson was employed as a Vice President of Philanthropic Engagement at Washington Area Women's Foundation ("WAWF").  Dkt. Nos. 54 at 1; 56 at 2.

2.      Guardian issued group Policy No. G-00512432 (the "Policy") to WAWF to insure the life insurance, long-term disability ("LTD"), and short-term disability ("STD") components of WAWF's employee welfare benefit plan (the "Plan").  AR131.

3.      As an employee of WAWF, Plaintiff was a participant in the Plan.  AR5.

4.      Guardian serves as a claims fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the Plan with respect to benefits under the Plan. AR89; AR355.

5.      "Disability" or "Disabled" for purposes of Plaintiff's eligibility for disability benefits is defined in the Policy as follows:

> These terms mean that a current *sickness* or *injury* causes physical or mental impairment to such a degree that you are:
>
> (1) During the *elimination period* and the *own occupation* period, not able to perform, on a full-time basis, the major duties of your *own occupation*;
>
> (2) After the end of the *own occupation* period, not able to perform, on a full-time basis, the major duties of any *gainful work*. . . .

_____

[2] The Administrative Record was docketed in its entirety in four parts in Docket Entries 47-1 through 47-4.  Following the parties' naming convention, references to the Administrative Record will be cited as "AR" followed by the specific page number of the record citation.

AR337 (emphasis in original).

6.      The Policy's "Own Occupation Period" is defined as the first twenty-four (24) months of payments under the Plan.  AR336.

7.      The Policy defines the term "Gainful Work" or "Gainful Occupation" as follows:

Work for which you are, or may become, qualified by: (a) training; (b) education; or (c) experience.  When you are able to perform such work on a full-time basis, you can be expected to earn at least 60% of your indexed *insured earnings* within 12 months of returning to work.

AR359 (emphasis in original).

8.      A claimant must provide Guardian with ongoing "Proof of Loss" under the Policy. AR337-38.  Under the Policy's "Proof of Loss" provision, the insured "must provide *objective medical evidence* from a *doctor*" and "[p]roof that [they]: (i) are currently; and (ii) have been *receiving regular and appropriate care* from a *doctor*, from the date *disability* began" to support their claim.  AR352-53 (emphasis in original).

9.      During any Gainful Work period, "objective medical evidence" is defined as:

May include but is not limited to: (a) diagnostic testing; (b) laboratory reports; (c) medical records of a *doctor's* exam documenting: (i) clinical signs; (ii) presence of symptoms; and (iii) test results consistent with generally accepted medical standards supported by nationally recognized authorities in the health care field.

AR360 (emphasis in original).

10.     The Policy contains a "Limited Maximum Payment Period" for the following conditions: (i) musculoskeletal and connective tissue disorders, including but not limited to sprains or strains of joints or muscles, soft tissue conditions, repetitive motion syndromes or injuries, and fibromyalgia; (ii) chronic fatigue conditions, including but not limited to: chronic fatigue syndrome, chronic fatigue immunodeficiency syndrome, or Epstein-Barr syndrome; (iii) chemical and environmental sensitivities; (iv) headache; (v) chronic pain or myofascial pain; (vi) gastro-

esophageal reflux disorder; (vii) irritable bowel syndrome; and (viii) vestibular dysfunction, vertigo, and dizziness.  AR345 (discussing the "Limited Benefit Provision" or "LBP").

11.     The Policy also provides that the LBP will not apply to disabilities caused or contributed to by the following conditions: (i) arthritis; (ii) ruptured intervertebral discs; (iii) spinal fractures; (iv) osteopathies; (v) spinal tumors, malignancy or vascular malformations; (vi) radiculopathies, documented by electromyography ("EMG"); (vii) spondylolisthesis, Grade II or higher; (viii) myelopathies; (ix) demyelinating diseases; or (x) traumatic spinal cord necrosis. AR345-46.

12.     The Policy includes a benefit to continue life coverage without payment of a premium ("life benefit with waiver of premium" or "LWOP") if the participant is totally disabled. AR222.  Specifically, the Policy's LWOP provision defines total disability as follows:

> Total Disability or Totally Disabled means, due to sickness or injury, you are:
> (a) Not able to perform any work for wages or profit; and
> (b) You are receiving regular doctor's care appropriate to the cause of disability.

*Id*.

13.     Plaintiff stopped working on December 13, 2018 at age 47 due to symptoms of migraines and cervical radiculopathy.[3]  AR429-30.[4]

14.     In January 2019, Plaintiff submitted her STD claim form, which was signed by her treating neurologist, Dr. James Bicksel.  AR2292.  In the form, Dr. Bicksel set forth those two

---

[3] The parties did not define "cervical radiculopathy," but the Mayo Clinic explains that "[r]adiculopathy refers to symptoms that develop when there is compression of a spinal nerve root" and that, "[w]hile any nerve root can be affected, the lower cervical (neck) and lower lumbar (low back) levels are the most common."  *Radiculopathy*, Mayo Clinic Orthopedics and Sports Medicine, https://sportsmedicine.mayoclinic.org/condition/radiculopathy/ (last visited January 9, 2024).

[4] *See also* Dkt. 56 at 3 (asserting that Paulson suffers from "migraine disease" and "cervical radiculopathy").

conditions as her diagnosed conditions.  *Id*.

15.     Additionally, with her STD claim form, Paulson submitted a two-page memorandum in which she claimed to suffer from a "number of significant symptoms which have impacted me, and now are significantly limiting." AR2333-34.[5]

16.     Guardian approved Paulson's STD claim[6] and paid Paulson STD benefits for the maximum benefit period.  AR2057; AR2118; AR2247.

17.     In response to a headache questionnaire, Dr. Bicksel indicated that Paulson had undergone an MRI which revealed "degenerative disc disease cervical radiculopathy."  AR2297. Dr. Bicksel indicated that, during times of headache, "pain combined with dizziness" would make "basic work functions impossible."  *Id.*  Dr. Bicksel also indicated that Paulson could be impacted up to fifteen days a month with pain of 5+ (presumably on a 10 point scale) and that as a result she could suffer from concentration issues, confusion, vertigo, photosensitivity, or visual disturbances. *Id.*  In terms of whether Plaintiff could return to her job, Dr. Bicksel opined: "The patient requires low-stress and rest in hopes of returning to a sufficient number of days of functioning with mild or no impairment to be able to meet the essential requirements of her position."  AR2295.

18.     In a March 12, 2019, Nurse Practitioner Dawn Smith – apparently a member of Dr.

---

[5] Paulson cites over one hundred pages of medical records for the proposition that her medical providers also identified other comorbid ailments. Dkt. 56 at 4.  Without a more specific citation to those medical records, it is difficult for the Court to determine whether those records actually support Paulson's claims.  But, in any event, the STD claim form provided by Paulson and signed off on by Dr. Bicksel relies on Paulson's migraines and cervical radiculopathy. AR2318.  Additionally, Dr. Bicksel when specifically asked "what diagnoses has this patient received" responded only by identifying "migraine with aura" and "cervical radiculopathy." AR2322.

[6] For purposes of STD, "Disability" or "Disabled" means that "a current *sickness* or *injury* causes physical or mental impairment to such a degree that the covered person is: (a) not able to perform, on a full-time basis, the major duties of his or her *own job*; and (b) not able to earn more than this plan's maximum allowed *disability earnings*." AR104 (emphasis in original).

Bicksel's office – submitted a form indicating: "migraine impacts patient's ability to concentrate and communicate [sic] symptoms are worsened by florescent lights and heat." AR2146. Nurse Smith further noted: "patient unable to concentrate and communicate during migraines which are occurring almost daily at present" and "not anticipated to work capability." *Id*.[7]

19.    In a letter dated April 12, 2019, Guardian approved Paulson's claim for LTD benefits and advised that benefits were payable as of March 18, 2019. AR2117-2122.

20.    By letter dated November 8, 2019, the Social Security Administration ("SSA") awarded Paulson Social Security Disability Insurance ("SSDI") benefits effective June 2019. AR1664-1669.

21.    In September 2019, Guardian arranged for an initial claim review by its in-house Nurse Case Manager ("NCM"). AR456-57. The NCM opined that Paulson's "daily migraine [headaches] . . . likely impairs concentration/focus [and] is reasonably supported by med recs to 11/2019 . . . The med recs on file mainly address migraines & not cervical radiculopathy/cerv degenerative disease." *Id*. The NCM requested updated medical records "so we can see what are restr/limitations from cerv. issue [sic]." *Id*.

22.    In September 2019, Paulson submitted additional information to Guardian. AR2004-09. The additional information appears to have come from Nurse Smith. AR2007 (signature of Donna Smith); AR2008 (signature of Donna Smith); AR2009 (signature of Donna Smith). Nurse Smith opined that Paulson's return to work is "unknown" and that she currently

---

[7] Paulson quotes from the March 12, 2019 form as if these statements are all part of one response. Dkt. 56 at 5. They are not. Rather, these excerpts reflect Nurse Smith's responses to three separate questions. AR2146. Furthermore, Paulson refers to the opinions as belonging to Dr. Bicksel. However, while Nurse Smith appears to be someone in Dr. Bicksel's office, it was Nurse Smith – not Dr. Bicksel – who signed the form and Nurse Smith did not indicate that she was signing on behalf of or at the direction of Dr. Bicksel. *Id*.

does not "have the capacity to return to work" as Paulson's "credible self-reports" indicate that "she would have missed work or had work significantly impaired by symptoms over 65% of work days over the most recent four months." *Id.*[89]

23.    Based upon the NCM review, Guardian advised Paulson, in a letter dated March 31, 2020, that Paulson had a maximum benefit payment of twenty-four months pursuant to the LBP, even though medical information continued to support ongoing impairment due to both her migraine headaches and cervical radiculopathy.  AR1734-36.  Guardian further advised that, under the LBP, Paulson's LTD benefits would terminate on March 17, 2021.  *Id.*[10]

24.    Guardian first received notice of the SSA's Notice of Award of SSDI in November 2020.  AR467.

25.    As part of Paulson's submission of ongoing proof of loss, on November 6, 2020, Paulson provided updated medical information, including: (i) a form submitted by Dr. Mariapaz S. Babcock, D.O., who opined that Paulson has "multiple diagnoses that limit her capacity to work" and impacted her physically and cognitively; and (ii) a form submitted by Dr. Himanshu Suri, a neurologist, who opined that Paulson's "symptoms of pain, brain fog, memory loss, aphasia, fatigue, disorientation, [undecipherable], etc." which "limits her ability to concentrate/function

---

[8] Guardian correctly objects to Paulson continuing to refer to these opinions as belonging to Dr. Bicksel.  Dkt. 58.  There is no indication that Dr. Bicksel was the source of these opinions.

[9] Paulson also refers to additional letters dated November 5, 2019 and January 28, 2020 but fails to cite to any portion of the Administrative Record containing those letters or to otherwise cite to any other document.  Thus, this Court will not consider Paulson's arguments based on those letters.

[10] In her Statement of Facts, Paulson asserts –without citation – that her medical conditions go well beyond the two conditions that she listed on her STD form.  Dkt. 56 at 6.  Moreover, citing to the entirety of the four-hundred-page Policy, Paulson argues that her benefits were not limited to 24-months.  Because these are arguments unsupported by specific citations to the record, they are not considered undisputed statements of fact here.

working on computer for > 1 hour."  AR1525-27; AR1536-40.

26.    Guardian referred the file for a follow-up NCM review on November 23, 2020. AR477-480 (referring to "RNCM ONGOING REVIEW").  The NCM listed diagnoses of chronic migraine, fibromyalgia, cervical radiculopathy, degenerative disc disease, and lower back pain. AR477.  The NCM noted that Paulson's ongoing symptoms and treatment supported continued approval of the claim.  AR480.

27.    Based on the November 23, 2020 NCM review, Guardian accepted liability through the LBP maximum duration of March 17, 2021.  AR482.

28.    In December 2020, Guardian notified Paulson that it was seeking its overpayment for the SSDI benefit offset based on her receipt of SSDI benefits from SSA.  AR1513-16.

29.    On January 7, 2021, Guardian's Claims Manager contacted Paulson's attorney by phone and requested copies of all recent testing, including EMG and MRI test results.  AR483. The Claims Manager further requested that they be submitted within fifteen days.  *Id*.  Paulson did not submit the additional information by the deadline.  AR484.

30.    In a letter to Paulson's attorney on January 29, 2021, Guardian advised of an outstanding overpayment in the amount of $35,568.88 on Paulson's claim due to her award of SSDI benefits.  AR1508.

31.    In a letter dated February 9, 2021, Guardian advised that it was terminating Paulson's claim for LTD as of March 17, 2021 pursuant to the LBP.  AR1499-1506.  Guardian also reminded Paulson of the outstanding overpayment.  *Id*.

32.    In a letter dated March 1, 2021, Paulson disputed the 24-month limitation on her

benefits and requested a copy of her claim materials.  AR1486-90.[11]

33.     In a letter dated April 9, 2021, Guardian advised that it was terminating Paulson's LWOP benefits under the Plan because it had not received proof of continued disability, based on her failure to respond to the January 2021 request.  AR1466-67.

34.     On August 4, 2021, Paulson submitted her administrative appeal of Guardian's adverse benefits decision on her LWOP and LTD claims.  AR1179-1201.  In her appeal, Paulson argued that she suffers from Migraine Disease, which is not a specific limiting condition in the Policy, and that her diagnosis of cervical radiculopathy supported by EMG prevents the application of a limitations period.  *Id*.  With her appeal, Paulson submitted: (i) letters from her treating neurologists, Dr. Suri and Dr. Carrie Dougherty; (ii) a June 4, 2021 office visit note with treating neurologist Dr. Sait Ashina; (iii) a Life Waiver of Premium Medical Request from Nurse Smith; (iv) January 11, 2019 MRIs of the brain and cervical spine; December 10, 2019 MRIs of the cervical spine and temporomandibular joint;[12] (vi) a January 14, 2019 EMG report; and (vii) additional treatment records.  AR1202-1301.

35.     The submissions by Dr. Suri and Dr. Dougherty rejected Guardian's determination that a migraine is a headache.  AR1203-06.

36.     The submission by Dr. Ashina determined that Paulson was not in "acute distress," that she suffered from "intractable headache," that she had "[n]ormal range of movements" and that "[h]er degenerative changes and radiculopathy are contributing to her headaches."  AR1220-21.

_____

[11] Paulson referred to this as a March 1, 2019 letter.  Dkt. 56 at 8.  As the actual letter reflects, the letter is dated March 1, 2021.  AR1486.

[12] Although the parties do not define this term, the temporomandibular joint (or "TMJ") are the two joints connecting the jaw bone to the skull.

37.     On September 15, 2021, Guardian provided Paulson with written notice that the adverse benefits decision on her LWOP claim had been overturned on appeal and that she continued to remain eligible for waiver of premium so long as she continues to satisfy the terms of the Plan.  Dkt. 54-1.

38.     During Paulson's appeal, Guardian arranged for another review by its NCM. AR490-98.  The NCM noted that Paulson went out of work due to "worsening uncontrolled migraines" and that "multiple treatments including a variety of medications were ineffective." AR496.  The NCM also noted that Paulson complained of "neck pain radiating to the LUE w/numbness in left hand w/EMG noting left C-7 radiculopathy."  *Id*.

39.     Based on the NCM's review, Guardian referred the file for an independent physician consultant ("IPC") review.  AR498.

40.     On October 6, 2021, Guardian sent a letter to Paulson indicating that it had reviewed her claims that her radiculopathy was no longer restricted by the 24-month limitation and that a migraine is not a headache.  AR724-727.  Guardian also provided an assessment by its own doctor, Dr. Lorne Label, a board-certified neurologist.  AR728-47.

41.     Dr. Label opined that Paulson "appears to be permanently impaired by her migraine headaches."  AR728.  He further opined that migraines are a type of headache; specifically, "[h]eadaches are a general category, the most frequent type being migraines."  AR730.

42.     As to Paulson's restrictions or limitations, Dr. Label opined that "it appears that [Paulson] is quite incapacitated with her near-daily headaches for which there has been no successful treatment."  AR730.

43.     As to whether Paulson's cervical radiculopathy is independently disabling, Dr. Label opined that, by itself, it "would not cause any limitations or restrictions on activity."  AR731.

44.     Dr. Label also opined that "[m]igraines do not cause any true cognitive impairment." *Id*.

45.     On October 26, 2021, Paulson's counsel contacted Dr. Label directly, through R3 Continuum LLC (the vendor through which the IPC review was arranged), challenging Dr. Label's findings and requesting that Dr. Label answer a series of questions.  AR706-09.

46.     On November 4, 2021, Paulson's counsel sent a letter to Guardian responding to Dr. Label's report and specifically attacking Dr. Label's failure to respond to the October 26, 2021 letter sent just a few days before.  AR613-20.[13]  The letter included information from Paulson's treating physician, Dr. Babcock, as well as a letter from Dr. Dougherty and Dr. Kate Bedrin, who specialize in Headache Medicine.[14]  AR621-24.

47.     In her letter, Dr. Babcock noted that Paulson "continues with features and symptoms of ongoing radiculopathy" and her "many conditions, especially her refractory chronic migraine, continue to limit her from doing any job."  AR621-22.

48.     In their letter, Drs. Dougherty and Bedrin assert that Dr. Label "does not hold equivalent training to serve as a second opinion in headache medicine."  AR623.  They also asserted that "[c]ognitive dysfunction is a frequent manifestation of migraine attacks," similar to the term "brain fog" used by Dr. Label.  *Id*.

49.     On November 10, 2021, R3 Continuum sent Paulson's counsel a letter indicating

---

[13] In the letter, counsel accuses Dr. Label of bias, but this appears to be a general accusation of bias based on his status as a contracted review physician. AR613-14. Absent specific facts or comments revealing bias, this argument is not appropriate for the undisputed statement of facts. Moreover, Magistrate Judge Ivan D. Davis granted Guardian's motion for a protective order based on these accusations because in response to that motion Paulson – as she does here – only made general accusations of bias and misstatements.  Dkt. 43.

[14] Interestingly, Dr. Dougherty is the Fellowship Program Director of Headache Medicine and Dr. Bedrin is a Headache Medicine Fellow.  AR624.

that Guardian "requested you direct your request" for Dr. Label to Guardian directly.  AR610.

50.     On November 23, 2021, Paulson's counsel advised Guardian of R3 Continuum's response and inquired whether Dr. Label would respond to Paulson's questions.  AR605.

51.     The NCM engaged on appeal summarized the record evidence available in November 2021 as demonstrating: (i) that Paulson's primary diagnosis was refractive chronic migraine and chronic migraine with and without aura; (ii) that Paulson's primary diagnosis was a type of headache; and (iii) that Paulson's other conditions or comorbidities do not rise to the level of severity that would "R/L" Paulson.  AR509-10.

52.     On December 7, 2021, Guardian provided Paulson with notice that the adverse benefits determination of Paulson's LTD claim had been upheld on appeal.  AR594-98.  The letter advised that there was no evidence of any restrictions or limitations from a condition not listed under the LBP that would preclude Paulson from performing the major duties of gainful work as of March 18, 2021 and, therefore, no additional benefit payment would be forthcoming.  *Id*.

53.     On December 8, 2021, Paulson requested her claim file from Guardian.  AR569-74.  It appears that a paper copy of the claim file was overnighted to Paulson's counsel on January 5, 2022.  AR526.  Paulson's counsel had to follow up with Guardian employees several times, however, to receive the CD version of the file.  AR518-44; AR548-557; AR567-568; AR575-79; *see also* Dkt. 48-1.[15]

---

[15] Pursuant to the March 6, 2023 Order in this case, Paulson was permitted to file objections and to supplement the Administrative Record.  Dkt. 44.  She did so and supplemented the record to add additional emails between her counsel and Guardian regarding access to her claim file.  Dkt. Nos. 48; 48-1.

B.   Procedural Background

On March 16, 2022, Paulson filed her Complaint in the Southern District of New York. Dkt. 1.  On May 27, 2022, Guardian filed its Answer.  Dkt. 8.  That same day, Guardian filed a motion to transfer the case to this District.  Dkt. Nos. 10; 11.  Paulson opposed transfer.  Dkt. 13. On July 12, 2022, Magistrate Judge James L. Cott of the Southern District of New York issued an Opinion and Order transferring this case to the Eastern District of Virginia.  Dkt. 22.  On July 27, 2022, a Transfer Order issued, officially transferring this case to the Eastern District of Virginia. Dkt. 23.

On September 29, 2022, a Scheduling Order issued.  Dkt. 32.  On January 6, 2023, Guardian filed a motion for a protective order.  Dkt. 36.  Paulson opposed the motion.  Dkt. 39. The parties also filed a consent motion to extend discovery and file summary judgment motions. Dkt. 40.  On February 15, 2023, Magistrate Judge Ivan D. Davis, of this District, granted the motion for a protective order, but denied the consent motion to extend.  Dkt. 43.

A final pretrial conference was held on February 16, 2023.  Dkt. 44.  On March 6, 2023, an order issued setting deadlines for the filing of the administrative record and for dispositive motions.  Dkt. 46.  On April 28, 2023, the parties filed cross-motions for summary judgment and attendant briefs.  Dkt. Nos. 53-55.  On May 12, 2023, both parties filed their oppositions to the other party's motion.  Dkt. Nos. 58-59.  On May 19, 2023, both parties filed replies in support of their own motions.  Dkt. Nos. 60-61.

II.   LEGAL STANDARD

Summary judgment is appropriate where a court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 330 (1986).  As district courts within the Fourth Circuit recognize,

"ERISA actions are usually adjudicated on summary judgment rather than at trial." *Prowell v. UPS Flexible Benefits Plan*, 2011 WL 51109291, at *3 (D. Md. Oct. 26, 2011) (citing *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260 (4th Cir. 2009)).

The Supreme Court has held that courts are "to review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Where the plan provides to the contrary by granting the administrator or fiduciary "discretionary authority," the Supreme Court has held that "trust principles make a deferential standard of review appropriate" and that a deferential standard is an abuse of discretion standard. *Id.* In the instant case, the Policy provides Guardian with discretionary authority. AR89; AR355.

Under the abuse of discretion standard, a court will uphold a discretionary determination provided that it is reasonable. *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997), even if the court would have reached a different conclusion on its own, *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004). Substantial evidence is "that which a reasoning mind would accept as sufficient to support a particular conclusion" and which "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Keith v. Fed. Exp. Corp. Long Term Disability Plan*, 2010 WL 1524373, at *4 (W.D. Va. Apr. 15, 2010) (internal citations and quotations omitted). The initial granting of disability benefits does not lift the burden of establishing a continuing disability from the claimant. *See, e.g.*, *Hensley v. IBM, Corp.*, 123 F. App'x 534, 538 (4th Cir. 2004) ("[T]he decision to grant benefits initially cannot create an obligation by which a fiduciary is estopped from later terminating benefits.").

In determining the reasonableness of an administrator's or fiduciary's discretionary determination, the Fourth Circuit has identified eight nonexclusive factors that a court may consider. *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000).  Those factors include:

> (1) the language of the plan; (2) the purpose and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43.

## III.   ANALYSIS

Paulson's Complaint contains two claims: first, a denial of ERISA benefits claim and, second, a penalty claim based on Guardian's alleged failure to comply with requests for information.  Dkt. 1 at 11-12.[16]  Both parties have moved for summary judgment on both counts.

In addition to the analysis of the relevant *Booth* factors that both parties make, Paulson makes an argument that Guardian did not provide her with proper notice of the basis of denying her benefits with respect to *both* her claimed disabilities.  Dkt. 56 at 26-27.  Thus, as an initial matter, the Court must assess the notice provided to Paulson before turning to the reasonableness of the benefits denial and whether Guardian is subject to penalties for its alleged failure to comply with requests for information.

---

[16] Without any basis, Paulson asserts in her Opposition Brief that Guardian asserted a counterclaim against her that must be dismissed. Dkt. 59 at 19-20.  Guardian denies that it asserted a counterclaim.  Dkt. 60 at 15.  The Answer also does not purport to assert a counterclaim; rather, the Answer claims an entitlement to offset.  Dkt. 8.  Accordingly, this Court finds that Guardian has not asserted a counterclaim.

A. Notice

As the Fourth Circuit made clear in *Gagliano v. Reliance Standard Life Insurance Company*, ERISA requires that claimants be provided with a full and fair review, including "the opportunity for the claimant to appeal the adverse benefits determination and to submit written comments or records."  547 F.3d 230, 235 (4th Cir. 2008); 29 C.F.R. § 2560-503-1(h)(2)(ii)-(iv). This statutory requirement extends to any new grounds for an adverse benefits determination given in final denial letters because those new grounds are effectively initial denials on the new grounds. *Id*. at 236.

Here, Paulson argues that she was not given proper notice that Guardian considered her migraine headaches to be subject a 24-month limitation period or that Guardian did not consider her cervical radiculopathy to be disabling.  With respect to the migraine headaches, Paulson was notified in her April 12, 2019 LTD benefit approval letter that, "[a]fter 24 months of payments if you remain disabled due to a condition not subject to a limitation of benefits, the definition of disability changes" and refers Paulson to the policy booklet for "a listing of disabilities with a maximum payment period."  AR2117.  Thus, Guardian notified Paulson, in the LTD benefit approval letter, of its intent to apply the Limited Benefit Provision or LBP, which specifically limits coverage for headaches.  AR345.  Next, in a March 31, 2020 letter, Guardian advised plaintiff that "a limited benefit duration applies to the condition for which you are claiming disability," included the list of disabilities subject to the limitation, and advised that Paulson's benefits would terminate on March 17, 2021.  AR1734-36.  The Court agrees that this provided clear notice to Paulson that Guardian intended to rely on the LBP.  In the February 9, 2021 termination of benefits letter, Guardian reiterated that, "due to the nature of the condition causing your claimed disability, your eligibility for benefits is limited to a maximum of 24 months of

payments." AR1499.  The letter further specifically links the application of the limitation period to her migraines.  *Id*.  Additionally, the letter specified what materials Paulson could submit to appeal the denial of her claim.  AR1501.  Moreover, Paulson understood what information was required of her, as she submitted information from her medical providers specifically addressing whether her migraines fell within the scope of the headache benefits limitation.  AR613-24. Accordingly, the Court finds that Paulson was on notice that Guardian was denying her continuing benefits based on her migraines because of the application of the headache limitation in the LBP.[17]

The same cannot be said for Guardian's handling of Paulson's disability claim related to her cervical radiculopathy.  With respect to that diagnosis and claimed disability, Guardian offers a shifting explanation for the denial of benefits.  In the February 9, 2021 letter, Guardian asserts that Paulson's cervical radiculopathy is also subject to the 24-month limitation.  AR1499.  But in the December 7, 2021 final denial letter, Guardian acknowledged that Paulson's cervical radiculopathy was supported by an EMG, which removes it from the LBP.  AR597 (acknowledging "the EMG confirming Ms. Paulson's cervical radiculopathy was provided which confirms that her radiculopathy is not considered a condition with a twenty-four month maximum payment period").  The December 7, 2021 letter then provides a new basis for the denial of benefits that neither the cervical radiculopathy "nor any other condition, as of March 18, 2021, support continued disability as defined by this plan."  *Id*.  This "shift" in Guardian's decision-making violates ERISA's notice requirements because Paulson did not have an opportunity to appeal the

---

[17] Paulson argues that the application of the 24-month limitation should only run from her receipt of notice that Guardian considered her migraines subject to the limitation.  That would undermine the purpose of the 24-month limitation in the Plan and Paulson cites to no provision of the Plan or to any case authority supporting this interpretation.

denial on that basis. *Brooks v. Hartford Life & Accident Ins. Co.*, 525 F. Supp. 3d 687, 699 (E.D. Va. 2021) *vacated in part by* 2021 WL 9958667 (E.D. Va. Apr. 5, 2021).[18]

The remedy for this notice violation with respect to Paulson's cervical radiculopathy, however, is not a grant of summary judgment in favor of Paulson, but rather a remand of this issue for Guardian to provide the full and fair review to which Paulson is entitled. The Fourth Circuit has explicitly held that, "where there is a procedural ERISA violation, we have recognized that the appropriate remedy is to remand the matter to the plan administrator so that a 'full and fair review' can be accomplished." *Gagliano*, 547 F.3d at 240. In this District, where a plaintiff has established a notice violation, judges have applied *Gagliano* and remanded the issue to the plan administrator for further proceedings. *See Brooks*, 525 F. Supp.3d at 700 (remanding based on lack of notice where plan administrator provided shifting explanation of denial of benefits). Accordingly, whether Paulson is entitled to benefits based on a disability caused by or contributed to by her cervical radiculopathy,[19] will be remanded to Guardian for a full and fair administrative review.

B. Denial of Disability Benefits Related to Migraines

Having determined that Paulson had notice that Guardian viewed her migraines claim as subject to the LBP, it is necessary to determine – through an analysis of the *Booth* factors – whether that decision was unreasonable.

---

[18] U.S. District Judge T.S. Ellis, III vacated part of his order at the Plaintiff's request so that Plaintiff could take an immediate appeal. *See* 2021 WL 9958667 at *1.

[19] As Guardian acknowledged in the December 7, 2021 letter – which shifted the explanation for denial of benefits away from the LBP – the LBP "will not apply to disabilities *caused or contributed* to by the following conditions . . . [r]adiculopathies, documented by EMG." AR345 (emphasis added).

i. *The Language of the Plan and Guardian's Interpretation of the Plan*[20]

In interpreting a Plan, the Supreme Court has directed that a "plan documents rule" be applied, under which "the directives of the plan documents" govern in determining how to disburse benefits. *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 555 U.S. 285, 300, (2009). Plan administrators and fiduciaries are granted primary interpretive authority over an ERISA plan according to the plan documents rule, which preserves the careful balancing upon which ERISA is based. *Firestone*, 489 U.S. at 109. When interpreting the language of a plan, courts have said that it must be given its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words. *Parker v. Kraft Foods Global Inc.*, 2010 WL 1929555, at *13 (W.D.N.C. May 12, 2010).

Under the Limited Benefit Provision or LBP, benefits for "headaches" are limited to twenty-four months. AR345. The plain meaning of the broad term "headaches," includes the more specific "migraine headaches." As retired U.S. District Judge Gerald B. Lee has previously held in an ERISA case, "[p]lan administrators are granted primary interpretative authority over an ERISA plan" and, specifically, that the plan administrators in that case acted reasonably when the administrators "classified 'migraine headaches' as part of the category of 'headaches.'" *Hilton v. UNUM Life Ins. Co. of Am.*, 967 F. Supp. 2d 1114, 1123 (E.D. Va. 2013). Here, too, Guardian acted reasonably when it classified migraine headaches as part of the general category of headaches.

---

[20] To the extent the fourth *Booth* factor also refers to consistency of the Plan administrator's or fiduciary's interpretation with past interpretations of the Plan, the Court does not find that factor particularly relevant and neither party addressed it. Additionally, the parties did not discuss and the Court does not find relevant the seventh *Booth* factor: external standards relevant to the exercise of discretion.

Moreover, given the Administrative Record in this case, it was not unreasonable for Guardian to determine that Paulson's chronic migraines fell within the general category of "headaches" and thus were subject to the LBP. Indeed, Guardian's interpretation of "headaches" as including Paulson's "migraine headaches" is clear from the start of the claims process. In 2019, in response to Paulson's STD claim, Guardian requested that Paulson's doctor complete a "Residual Functional Capacity Questionnaire: HEADACHES." AR2296 (capitalization in original). Neither Paulson nor Dr. Bicksel objected to completing the form and it was Dr. Bicksel's opinion that, "*during times of headache*" Paulson's "pain combined with dizziness makes basic work functions impossible." AR2298. The plain meaning of the term "headaches" is further evidenced by the specialties of Paulson's doctors. Drs. Dougherty and Bedrin, who opine on Paulson's migraines, are part of a "Headache Medicine" fellowship program at MedStar Georgetown University Hospital. AR624. They also chastise Dr. Label for not having training in the subspecialty of "headache medicine." AR623. Moreover, Drs. Dougherty and Bedrin opine both that "Migraine is classified as a primary headache disorder" and that "[m]igraine is a chronic neurologic disease, of which headache is a symptom." *Id*. But the second opinion does not undermine the first opinion, nor does the second opinion make the conclusion that a migraine is a type of headache unreasonable. Guardian also referred out review of Paulson's condition and Dr. Label, similar to Drs. Dougherty and Medrin, described "headaches" as a general category of which migraines are a type. AR701. Thus, Guardian's interpretation of the Plan as only covering migraine headaches for 24-months under the LBP was reasonable based on the Plan language.

## ii. *Purpose of the Plan*

The purpose of the Plan also supports Guardian's interpretation. The purpose of the Plan is to provide benefits in accordance with the provisions of the Plan and in compliance with ERISA.

Here, Guardian applied the language of the Plan and found that Paulson was only entitled to benefits related to her migraines for 24-months because of the application of the LBP, thus supporting the purpose of the Plan.

### iii. *Adequacy of Materials Considered and Whether Decision-Making Was Reasoned and Principled*

The third and fifth *Booth* factors are somewhat similar and can be analyzed together.  Here, Guardian reviewed the materials submitted by Paulson from her nurses and doctors, reviewed the documentation provided, and sought out a second opinion from a board-certified neurologist. Guardian was ultimately deciding whether the ordinary meaning of the word headache encompassed "migraine headaches" such that migraine headaches fall within the LBP.  Here, Dr. Label's report finding that migraine headaches are a type of headache, Drs. Dougherty and Bedrin's report asserting that "Migraine is classified as a primary headache disorder," and Drs. Dougherty and Bedrin's own specialization in "Headache Medicine" all support the conclusion that migraine headaches fall within the broader umbrella of headaches.  AR730; AR623.   Whether migraine headaches also fall under the more specific category of a "chronic neurologic disease," does not undermine the determination that it is also readily understood as a kind of headache, as is clear from the qualifications and opinions of Paulson's own doctors.

Seeking to avoid this conclusion, Paulson argues that the materials reviewed were not adequate because Dr. Label did not respond to questions from Paulson.  Dkt. 56 at 20.  But most of the questions that Paulson sought to ask Dr. Label were related to the extent of her disability or to her cervical radiculopathy (which the Court has already found will be remanded to Guardian for further consideration), and *not* to whether migraine headaches are included in the umbrella of headaches more generally.  AR707-08.  But of the questions that pertain to Paulson's migraine headaches specifically, one appears to refer to Drs. Dougherty and Bedrin's specialization in the

"Headache Medicine" subspeciality, which would again appear to emphasize that the term headache is ordinarily understood to encompass migraine headaches. *Id*.  Another question posed by Paulson also suggests that the terms headache and migraine can be used interchangeably – supporting Guardian's reasoned interpretation. *Id*. ("Why is your practice focused on vascular rather than headache or migraine disease?").[21]   In this case, unlike the *Stull v. Life Ins. Co. of N. Am.*, 2021 WL 4993485 (W.D.N.C. Oct. 27, 2021) case cited by Paulson, there is no disagreement about the debilitating impact of these migraine headaches on Paulson – but rather a dispute about the meaning of the term headache.  Dkt. 56 at 20; AR730 (Dr. Label opined that Paulson "is quite incapacitated" as a result of her migraine headaches).  Thus, the lack of contact between Dr. Label and Paulson is not a strong consideration.

In sum, Guardian's conclusion that "migraine headaches" are a type of "headache" is amply supported by substantial evidence in the record, including the report by Dr. Label and submissions by Paulson's own doctors.

iv. *Consistency of Decision with ERISA Procedural and Substantive Requirements*

As discussed *supra* with respect to notice, Guardian's determination that Paulson's migraine headaches were subject to the LBP was fully consistent with ERISA's procedural and substantive requirements.  In this regard, Paulson presents no persuasive evidence that Guardian's determination violated the requirements of ERISA.  Although Guardian failed to give appropriate notice with respect to its decision regarding Paulson's cervical radiculopathy, that failure does not taint the decision-making process with respect to the denial of benefits for Paulson's migraine headaches after the expiration of the 24-month LBP.  *See Brooks*, 525 F. Supp.3d at 705.

---

[21] The Court notes that the answer to this question is largely irrelevant to any decision by Guardian or the Court.  What kind of medicine Dr. Label practices is certainly relevant, but why he chose an area of practice is not.

23

v. *Guardian's Motives and Any Potential Conflict of Interest*

Both parties acknowledge that a structural conflict exists here between Guardian's role as fiduciary and payor.  Dkt. Nos. 56 at 23; 58 at 17-18.  But as the Fourth Circuit has recognized, a "structural conflict, alone, is not sufficient to render [an administrator's] entire decisionmaking (*sic*) process unreasonable." *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 383 (4th Cir. 2018).  This is especially true where "there is no evidence that any such conflict impacted [the administrator's] adjustment and review." *Id.*  Here, there is significant evidence that the structural conflict did not impact Guardian's decision-making: (i) Guardian awarded Paulson benefits for the initial 24-month period; (ii) Guardian conducted multiple levels of review; (iii) Guardian referred review to a third-party board-certified neurologist; and (iv) with respect to Paulson's appeal of the LWOP decision, Guardian reversed itself on appeal.  Thus, this factor also weighs in favor of a finding that Guardian exercised reasoned decision-making.

*         *         *

In sum, all of the relevant *Booth* factors weigh in favor of Guardian and demonstrate that Guardian's application of the LBP provision to Paulson's migraine headaches was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." *Ellis*, 126 F.3d at 232.  Thus, the Court will grant Guardian's motion for summary judgment as it pertains to the denial of benefits related to migraine headaches and deny Paulson's motion to the extent it is based on the same.

C.  ERISA Penalties

Although both parties seek summary judgment with respect to the ERISA penalties claim, neither party has submitted sufficient argument or evidence at this point in time to resolve those issues.  Guardian's memorandum in support of its motion for summary judgment set forth no

undisputed facts with respect to the penalty claim and devoted less than a full page of analysis to the issue.  Dkt. 54 at 26.  Similarly, Paulson's only reference to the penalty issue in her statement of facts is a single conclusory sentence which cites to a number of portions of the record without identifying specific information for the Court's consideration and devotes less than a page of argument to the issue.  Dkt. 56 at 13, 28.  Accordingly, the Court will defer resolution of the issue and direct the parties to submit supplemental briefing that: (i) sets forth each parties alleged undisputed material facts related to the penalty issue, including whether and when Guardian sent a paper and/or CD-rom copy of the claim file and whether and when Paulson (or her counsel) received either a paper or CD-Rom copy of the claim file; (ii) addresses whether Guardian qualifies as a plan administrator under the Plan; and (iii) otherwise addresses any arguments pertinent to the penalty claim.

### D.  Attorney's Fees and Costs

Paulson also moves for an award of attorney's fees and costs.  ERISA provides that "a district court may, in its discretion, award costs and reasonable attorney's fees to either party under 29 U.S.C. § 1132(g)(1), so long as that party achieved some degree of success on the merits." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 634 (4th Cir. 2010).  The Court will deny without prejudice the request for attorney's fees.  After the Court has decided the final penalties issue, a motion for attorney's fees and costs may be made, if warranted.

### IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 53) is GRANTED-IN-PART, DENIED-IN-PART and DEFERRED-IN-PART; and it is

FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Dkt. 55) is GRANTED-IN-PART, DENIED-IN-PART and DEFERRED-IN-PART; and it is

FURTHER ORDERED that Defendant's Motion is granted insofar as the application of the Limited Benefit Provision to Paulson's migraine headaches was reasonable and Plaintiff's Motion is denied insofar as it challenged that determination; and it is

FURTHER ORDERED that Plaintiff's Motion is granted insofar as Paulson argued that she did not receive notice of Guardian's decision with respect to her cervical radiculopathy and Defendant's Motion is denied insofar as it sought summary judgment with respect to the denial of benefits based on Paulson's cervical radiculopathy; and it is

FURTHER ORDERED that the Court DEFERS ruling on whether Guardian is subject to penalties under ERISA for allegedly failing to timely provide Paulson access to her claim file; and it is

FURTHER ORDERED that the parties are DIRECTED to file simultaneous supplemental briefs addressing the application of the ERISA penalties issue on or before March 1, 2024, responses will be due by March 15, 2024, and replies will be due by March 22, 2024;[22] and it is

FURTHER ORDERED that Guardian's determination that Paulson's cervical radiculopathy did not render her disabled within the meaning of the Plan is REMANDED to Guardian to allow Paulson to appeal that determination; and it is

---

[22] For their supplemental briefing, the parties are directed to follow the format required by Local Rule 56 with respect to summary judgment motions, including the format required for setting forth and responding to alleged undisputed statements of fact. The parties are further directed that their supplemental briefing must: (i) set forth each party's alleged undisputed material facts related to the penalty issue, including whether and when Guardian sent a paper and/or CD-Rom copy of the claim file and whether and when Paulson (or her counsel) received either a paper or CD-Rom copy of the claim file; (ii) address whether Guardian qualifies as a plan administrator under the Plan; and (iii) otherwise address any arguments pertinent to the penalty claim.

FURTHER ORDERED that Paulson's request for attorney's fees and costs is DENIED

WITHOUT PREJUDICE to renewal after the Court disposes of the penalty claim issue.

It is SO ORDERED.

Alexandria, Virginia
February 5, 2024

_____ /s/

Rossie D. Alston, Jr.
United States District Judge